UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-80521-CIV-Marra/Johnson

BELLE RP LLC, a Florida limited
Liability company,

    Plaintiff,

vs.

JPS CAPITAL PARTNERS, LLC,
a New York limited liability company,
JOHN DOE CORPORATION, an
Unknown corporate entity,
_____/

## ORDER AND OPINION

THIS CAUSE came before the Court on Plaintiff, Belle RP, LLC's ("Plaintiff" or "Belle") Motion for Partial Summary Judgment as to Liability and Partial Damages (DE 36), filed September 15, 2009.  The motion is fully briefed and ripe for review.  The Court has reviewed the motion, response, reply, the record in this case, and is otherwise duly advised in the premises.

**Background**

Plaintiff, Belle RP, LLC's ("Plaintiff" or "Belle") filed its Complaint (DE 1) against Defendant JPS Capital Partners, LLC ("Defendant" or "JPS") on May 16, 2008.  The Complaint arises out of a proposed loan based on a term sheet between Belle and JPS in 2005 that ultimately failed to result in a loan transaction between the companies.  Belle raises three claims against JPS:  Breach of Contract (Count I); Fraud in the Inducement (Count II); and Violation of

Florida's Deceptive and Unfair Trade Practices Act (Count III).  JPS filed a Counterclaim for Breach of Contract.

Plaintiff's motion for partial summary judgment seeks (1) entry of summary judgment on liability against JPS on Counts I-III of Belle's Complaint; (2) partial summary judgment for damages of $51,400.00 in cost and lender fee deposits; and (3) entry of summary judgment in Belle's favor on JPS's counterclaim.

**Undisputed Material Facts**

The facts, as culled from affidavits, exhibits, depositions, answers, answers to interrogatories and reasonably inferred therefrom, for the purpose of these motions, are as follows:

1.  Plaintiff, Belle RP, LLC, is a Florida limited liability company with the sole purpose of owning and managing Glades Glen Apartments in Belle Glades, Florida.  (Affidavit of Barry Leon at ¶ 2).

2.  Defendant, JPS Capital Partners, LLC, is a New York limited liability company with its principal place of business in New York, New York and which does business with entities throughout the United States.  (See Answer and Counterclaim, DE 5 at ¶ 3).

3.  During the relevant time period, JPS was in the business of "sourcing real estate bridge loans, mezzanine loans and first mortgages on behalf of hedge funds and other unregulated institutions that wanted to invest in the real estate space but didn't want to create their own real estate structure." (Deposition of Joel Shapiro at 7:11-16).

4.  JPS was formed in January, 2005 and the transaction with Belle was one of JPS' early projects.  (Shapiro Dep. at 6-7).

5. Belle had purchased Glen Glades apartments with purchase money financing that needed to be refinanced. (Shapiro Dep. at 8:1-3).

6. Broker Robert Chambre brought Belle to JPS Capital Partners to obtain a loan. (Shapiro Dep. at 11:4-9).

7. JPS received financial statements, lists of assets/calculation of value, and a report of the condition of the property at issue. (Shapiro Dep. at 19).

8. According to JPS partner Joel Shapiro, based upon the fact that JPS had enough information to generate a term sheet, Shapiro assumes that Belle had provided JPS with financial information, a request for a loan, a budget with projections, and rent rolls for the property. (Shapiro Dep. at 12).

9. On or about May 26, 2005, Belle entered into an agreement with JPS whereby JPS or an affiliate would consider providing financing to Belle. (See Term Sheet attached to Complaint; Shapiro Dep. at 10).

10. The term sheet was drafted jointly by JPS partners Shapiro, Jim Hopkins, Paul Schack, and former JPS partner and attorney, Stuart Gruskin. (Shapiro Dep. at 13-14).

11. JPS was aware that the loan was being requested in the context of a refinancing of an existing loan that was coming due on the property held by Belle, and closing was to occur on or before June 28, 2005. (Shapiro Dep. at 13, 33).

12. The term sheet states that JPS or an affiliate of JPS may be the lender. (See Term Sheet at p.1). The relevant language in the term sheet regarding the "Lender" is as follows:

> ..this Letter Agreement sets forth the general terms and conditions under which JPS Capital Partners, LLC, or its affiliate will consider providing financing ("the Loan") to fund the refinancing and renovation of the apartment complex known as Glen Glades Apartments ("the Project") located in Belle Glade, Florida ("the Property).

. . .

Lender: JPS Capital Partners, LLC or an affiliate.

(See Term Sheet at p.1).

13. The "Brokerage Fees" section of the term sheet states that "no broker other than Chambre & Company, Inc. has been involved in this transaction, and Borrower shall pay any fees due to the broker." (See Term Sheet at p. 4).

14. At the time JPS entered into the term sheet, its process was to perform due diligence on size and price structure and then bring the loan request to a funding provider JPS had a relationship with or to a third party for funding. (Shapiro Dep. at 36)

15. At the time JPS entered into the term sheet, it had no idea who the lender would be. (Shapiro Dep. at 35).

16. At the time JPS entered into the term sheet, it had no particular assurance that it would have a third-party lender. (Shapiro Dep. at 36).

17. JPS had an verbal commitment, not a written commitment, from a third party lender, Stillwater Asset-Backed Fund, to provide $10 million to JPS to loan to Belle RP. (Shapiro Dep. at 36; Shapiro Aff., DE 39 at ¶ 28).

18. The verbal commitment from third party lender, Stillwater Asset -Backed Fund, was for different terms than those set forth on the term sheet. (Shapiro Dep. at 37).

19. Belle initially paid JPS $75,000.00, which consisted of a "Fee Deposit" of $50,000.00 (stipulated "Lender's Fees" per p. 3 of the term sheet) and a "Cost Deposit" of $25,000.00 (stipulated in "Lender's Costs" per p. 3-4 of the term sheet).

20. Belle later paid JPS an additional $25,000.00 for "Lender's Costs," bringing the total of such "Cost Deposit" to $50,000.00. (Shapiro Aff. at ¶ 24).

21. The term sheet called for a mortgage with the following terms and conditions:

    a.    Loan Amount: $10,000,000.00
    b.    Interest Rate: at Lender's discretion, either (a) the greater of 10.50% or 740 basis points over 30 day LIBOR, per annum, or (b) the greater of 10.5% or the prime rate as published in the Wall Street Journal plus 450 basis points.
    c.    Borrower's Contribution: $1,800,000.00
    d.    Guarantors: B + K Leon FLP and Barry Leon

See term sheet, DE 36-2.

22. The term sheet states that the guarantors of the loan are: "B + K Leon FLP and Barry Leon." (term sheet at p.1).

23. Belle's broker, Robert Chambre, informed JPS that Barry Leon had sufficient wealth to act as a full recourse guarantor. (Shapiro Dep. at 12).

24. Belle represented to JPS that Mr. Leon had power of attorney over all of the family entities holding the assets and the family members involved. (Shapiro Dep. at 42).

25. While JPS does not independently value assets, it was not aware of any difference between the value of the assets offered by Barry Leon and the related family assets for the guarantee and what was learned in JPS' due diligence about the value of the assets. (Shapiro Dep. at 34).

26. JPS "had been proceeding under the assumption that the assets were owned solely by Mr. Leon. What [JPS] found is that virtually all of the assets were in family trusts or family partnerships, which [JPS] believed . . . would have made it significantly more difficult for [JPS] to be able to proceed against the guarantee in the unlikely event that [JPS] had to." (Shapiro Dep. at 41).

27. It was the nature and control of the assets offered for the guarantee, not the assets themselves, that concerned JPS regarding whether the guarantee was sufficient. (Shapiro Dep. at 41).

28. JPS hired third party vendors for an appraisal, marketing study, and an environmental report, among other due diligence, and in so doing spent a portion of the cost deposit. (See Shapiro Dep.). These reports took more time than expected to obtain.

29. Approximately $1,400.00 of the cost deposit monies were not used. (Shapiro Dep. at 30-31).

30. After all third-party vendor reports were in JPS' possession, JPS contacted Belle and offered a mortgage on terms requiring that Belle place a far greater amount of capital in the transaction and a far greater amount of money in the "Draw Account" than required in the term sheet. (Leon Aff. at ¶ 13).

31. The term sheet required that if the loan did not close for any reason, the unused portion of the cost deposit would be returned to Belle. See term sheet p. 4 ("...In the event the Loan fails to close for any reason, the unused portion of the Cost Deposit shall be returned to the Borrower.").

32. The term sheet also provided that if JPS determined that it would not proceed with the loan, the Fee Deposit of $50,000.00 would be returned less any costs not covered by the "Cost Deposit." See term sheet at p. 3 ("The Fee Deposit is consideration for the Lender performing evaluation, underwriting, and due diligence with respect to the Loan, and shall not be refunded unless Lender determines that it does not wish to proceed with the Loan. In the event the Lender determines not to proceed with the Loan, the Fee Deposit for the Loan will be

refunded, less any amount required to reimburse Lender for its actual costs that have not been covered by the Cost Deposit.").

33. JPS submitted documentation of expenditures made for due diligence from Belle's $50,000 Cost Deposit. (See Exhibit "E" to the Motion for Summary Judgment).  This documentation consisted of check stubs, disbursement records, and wire requests created by JPS. See id.  These expenditures totaled approximately $48,206.04. See id.

34. JPS did not produce cancelled checks or proof of receipt of wires for payments to vendors from Belle's cost deposit.

35. Belle's sale of the subject property occurred after Belle tried to continue working with JPS outside the time schedule stated in the term sheet.  (term sheet at p. 5; Leon Aff. at ¶ 11, 16).

**Disputed Material Facts**

1. There is a disagreement between the parties regarding the status of the lender. Belle's position is that it was led to believe that in dealing with JPS, it was dealing directly with the lender or someone in control of the lender. (Belle's Statement of Facts DE 36-9 at ¶ 12) See Leon Aff. at ¶ 5 ("JPS held itself out to us as a 'lender' who was capable of either financing the loan themselves or contractually bound to an 'affiliate' who had such financial capability.)   It is JPS' position that, under the term sheet, either JPS or an affiliate of JPS may be the lender, and that an underwriter may be involved. (JPS' Statement of Facts DE 38 at ¶ 1).

2. The parties disagree over whether the delay in obtaining the reports was warranted. It is JPS' position that Belle RP and Barry Leon provided "materially incorrect" information to JPS at the time it prepared the term sheet.  Additionally, JPS contends Belle exhibited dilatory conduct in providing accurate information to JPS, and that all due diligence was timely

performed by JPS once accurate information was provided by Belle and Barry Leon. (DE 36-7 Exh. F - Aug. 30, 2005 email; Shapiro Aff. at ¶ 26, 27). It is Belle's position that the delay was caused solely by a delay in JPS receiving third party reports. (Exh. D, June 24, 2005 letter).

      3. The parties also disagree about whether JPS ever offered Belle a loan consistent with the criteria set forth in the term sheet. It is Belle's position that JPS offered Belle a loan different from the loan set forth in the term sheet and that Belle did not want a different loan. (Leon Aff. at ¶ 16-17). It is JPS's position that JPS requested, but did not demand a modification of the loan terms. Thereafter, JPS was willing to go forward on the original terms, but Barry Leon, on behalf of Belle, decided to seek financing elsewhere. See DE 36-7, Aug. 30, 2005 e-mail from James Hopkins of JPS to Bob Chambre, at 2-3 ("When we indicated that we felt the circumstances justified revisiting the economics of the transaction, we were advised that the borrower would only proceed on the original terms. In response, we said that we would continue to work on this on the economic terms set forth in the term sheet, and at that point we learned that the borrower had decided to pursue other financing options."); see also Shapiro Aff. at ¶ 30 (By August 31, 2005, Barry Leon informed JPS Capital that he had opted for Belle RP to seek financing elsewhere.")

      4. The parties also disagree as to which party refused to go forward with the transaction. It is Belle's position that JPS failed to offer a loan at the same terms as the term sheet. (Leon Aff. at ¶ 14-17). Belle considers the alleged refusal by JPS to proceed with the loan on the original terms to mean that JPS decided not to proceed with the loan. Id. Belle also points to an August 31, 2005 email indicating that JPS does not agree to a reserve of $2.5 million as support for its position that JPS refused to go forward with the transaction. (See Exhibit "F" to the Motion for Summary Judgment.)

It is JPS' position that it did not fail to offer the loan. JPS relies upon the express language of the term sheet, that (1) the term sheet "does not constitute a commitment or obligation on the part of [JPS] to make the Loan, and that the fee earned upon execution of this Term Sheet is consideration for [JPS] reviewing, analyzing, and underwriting the loan application;" (2) JPS's approval of the loan is "contingent upon [JPS] completing, to its sole and absolute satisfaction, all necessary due diligence with respect to the proposed Loan. [Belle] shall fully cooperate with [JPS] with respect to [JPS]'s performance of due diligence and its underwriting of the Loan;" and (3) JPS' "approval of the Loan is dependant upon the satisfactory completion, in [JPS]'s sole and absolute discretion, of underwriting as deemed necessary or customarily required for transactions of this type, including but not limited to environmental testing, structural review, title review and insurance underwriting. . . ." See term sheet at p. 4, 5; see Shapiro Aff. at ¶ 13. It is JPS's position that Belle decided not to go forward with the loan because Barry Leon, on behalf of Belle, decided to seek financing elsewhere. See DE 36-7, Aug. 30, 2005 e-mail from James Hopkins of JPS to Bob Chambre, at 2-3 ("When we indicated that we felt the circumstances justified revisiting the economics of the transaction, we were advised that the borrower would only proceed on the original terms. In response, we said that we would continue to work on this on the economic terms set forth in the terms sheet, and at that point we learned that the borrow had decided to pursue other financing options."); see also Shapiro Aff. at ¶ 30 (By August 31, 2005, Barry Leon informed JPS Capital that he had opted for Belle RP to seek financing elsewhere.")

5. The parties disagree as to whether Belle was damaged by JPS's actions. It is Belle's position that it was damaged not only by the loss of the deposit funds of $100,000.00, but also by it having to do a "sacrifice sale." (Leon Dep. at ¶ 19, 20). It is JPS's position that Belle was not

9

damaged because it purchased the property for $9.5 million on March 17, 2005 and sold it for $10.2 million on April 6, 2006, thus selling it for $700,000 more than what Belle paid one year earlier. (Shapiro Aff. at ¶ 31).

**Standard of Review**

Summary judgment "shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of showing the Court, by reference to the record, that there are no genuine issues of material fact that should be decided at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the non-moving party bears the burden of proof on an issue, the moving party may discharge its burden by showing that the materials on file demonstrate that the party bearing the burden of proof at trial will not be able to meet its burden. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

When a moving party has discharged its burden, the nonmoving party must "go beyond the pleadings," and, by its own affidavits or by "depositions, answers to interrogatories, and admissions on file," designate specific facts showing there is a genuine issue for trial. Celotex, 477 U.S. at 324. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). When deciding whether summary judgment is appropriate, the Court must view the evidence and all reasonable factual inferences therefrom in the light most favorable to the party opposing the motion. Witter v. Delta Air Lines, Inc., 138 F.3d 1366, 1369 (citations and quotations omitted).

This Court may not decide a genuine factual dispute at the summary judgment stage. Fernandez v. Bankers Nat'l Life Ins. Co., 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung, 695 F.2d 1294, 1296 (11th Cir. 1983).  A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Hoffman v. Allied Corp., 912 F.2d 1379 (11th Cir. 1990).  However, there must exist a conflict in substantial evidence to pose a jury question. Verbraeken v. Westinghouse Elec. Corp., 881 F.2d 1041, 1045 (11th Cir.1989).

**Discussion**

**Count I: Breach of Contract; Counterclaim I: Breach of Contract**

Because the Court is sitting in diversity, Florida substantive law applies.  See, e.g., Admiral Ins. Co. v. Feit Management Co., 321 F.3d 1326, 1328 (11th Cir. 2003) ("Sitting in diversity, we apply the substantive law of the forum state unless federal constitutional or statutory law compels a contrary result.").

Under Florida law, a breach of contract action requires three elements: a valid contract, a material breach of that contract, and damages.  See, e.g., Beck v. Lazard Freres & Co., LLC, 175 F.3d 913, 914 (11th Cir. 1999); Miller v. Nifakos, 655 So. 2d 192, 193 (Fla. 4th DCA 1995). Here, there are disputes of material fact regarding each of the three elements.

First, regarding the existence of a valid contract, the entire premise of Belle's breach of contract claim is that, on or about May 26, 2005, the parties entered into an agreement for a particular loan as described in the term sheet.  However, the term sheet itself states that it "sets forth the general terms and conditions under which JPS Capital Partners, LLC, or its affiliate will

11

<u>consider providing financing</u> ("the Loan") to fund the refinancing and renovation of the apartment complex known as the Glen Glades Apartments ("the Project").  Thus, there are genuine issues of material fact as to whether there is a binding contract, and if there is, what are its terms.

Second, as to whether there was a material breach of contract, there are conflicting facts in the record regarding several key issues.  Most importantly, there are disputed issues of fact about which party, JPS or Belle decided not to proceed with the loan.  <u>See</u> ¶ 3 and 4 of Disputed Material Facts, <u>supra</u>.  It is Belle's position that JPS failed to offer a loan at the same terms as the term sheet. (Leon Aff. at ¶ 14-17).  Belle considers the alleged refusal by JPS to proceed with the loan on the original terms to mean that JPS decided not to proceed with the loan. <u>Id.</u>  Belle also points to an August 31, 2005 email indicating that JPS does not agree to a reserve of $2.5 million as support for its position that JPS refused to go forward with the transaction. <u>See</u> Exhibit "F" to the Motion for Summary Judgment.

In contrast, it is JPS' position that it did not fail to offer the loan.  JPS relies upon the express language of the term sheet, that (1) the term sheet "does not constitute a commitment or obligation on the part of [JPS] to make the Loan, and that the fee earned upon execution of this Term Sheet is consideration for [JPS] reviewing, analyzing, and underwriting the loan application;" (2) JPS's approval of the loan is "contingent upon [JPS] completing, to its sole and absolute satisfaction, all necessary due diligence with respect to the proposed Loan. [Belle] shall fully cooperate with [JPS] with respect to [JPS]'s performance of due diligence and its underwriting of the Loan;" and (3) JPS' "approval of the Loan is dependant upon the satisfactory completion, in [JPS]'s sole and absolute discretion, of underwriting as deemed necessary or customarily required for transactions of this type, including but not limited to environmental

testing, structural review, title review and insurance underwriting. . . ." See term sheet at p. 4, 5; see Shapiro Aff. at ¶ 13.  Moreover, JPS also relies on evidence in the record that JPS requested, but did not demand a modification of the loan terms, and thereafter was willing to go forward on the original terms, but Barry Leon, on behalf of Belle, decided to seek financing elsewhere.  See DE 36-7, Aug. 30, 2005 e-mail from James Hopkins of JPS to Bob Chambre, at 2-3 ("When we indicated that we felt the circumstances justified revisiting the economics of the transaction, we were advised that the borrower would only proceed on the original terms.  In response, we said that we would continue to work on this on the economic terms set forth in the terms sheet, and at that point we learned that the borrow had decided to pursue other financing options."); see also Shapiro Aff. at ¶ 30 (By August 31, 2005, Barry Leon informed JPS Capital that he had opted for Belle RP to seek financing elsewhere.").

Additionally, as to the material breach of contract element, there are disputed issues of fact over the status of the lender under the term sheet (see ¶ 1 of Disputed Material Facts, supra) and about the cause of the delay in obtaining the reports and whether that delay was warranted (see ¶ 2 of Disputed Material Facts, supra).

There are also genuine issues of material fact as to whether the alleged breach of agreement resulted in damages to either party.[1]  Under the language of the term sheet[2], the Fee

---

[1] At this stage in the litigation, the Court is only able to determine that approximately $1,400.00 of the cost deposit monies were not used, and are thus owed to Belle under the provisions of the term sheet. JPS appears to have agreed to repay Belle this amount.  (Shapiro Dep. at 30-31).

[2] Additionally, as to any other damages that may be alleged by Plaintiff, the Court points out that Belle has agreed that "any claim it may have for damages against Lender for any reason arising out of or relating to this Letter Agreement, shall be limited to the return of fees paid to Lender, less any third-party costs incurred by Lender. See term sheet at p. 5.

Deposit of $50,000.00 was to be returned only if JPS determined that it would not proceed with the loan. See term sheet at p. 3 ("The Fee Deposit is consideration for the Lender performing evaluation, underwriting, and due diligence with respect to the Loan, and shall not be refunded unless Lender determines that it does not wish to proceed with the Loan.").

Based on the foregoing, there are genuine issues of material fact precluding summary judgment as to Belle's claim for breach of contract (count I) and JPS' counterclaim for breach of contract (counterclaim I).

**Count II: Fraud in the Inducement; Count III: Violation of FDUTPA**

Counts II and III are closely connected, as Belle submits that a finding by the Court that JPS fraudulently induced Belle into agreeing to the term sheet would be sufficient to satisfy the burden of proving liability on a cause of action under Florida's Deceptive and Unfair Trade Practices Act. See DE 40 at 4 n.1.

The elements of fraud in the inducement in Florida are: 1) that the defendant misrepresented a material fact, 2) that the defendant knew or should have known that the statement was false, 3) that the defendant intended the representation would induce the plaintiff to enter into a contract or a business relation; and 4) that the plaintiff was injured by acting in justifiable reliance on the misrepresentation. Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc., 262 F.Supp. 2d 1334, 1342 n. 1 (S.D. Fla. 1999).

The FDUTPA declares unlawful any "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts of practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). "Although not specifically identified in the statute, there are three elements that are required to be alleged to establish a claim pursuant to the FDUTPA: 1) a

deceptive act or unfair practice; 2) causation; and 3) actual damages." KC Leisure, Inc. v. Haber, 972 So.2d 1069, 1073 (Fla. 5th DCA 2008).

Plaintiff's fraudulent inducement claim is predicated on the same allegations as his FDUTPA claim.  In essence, Belle claims in both counts that neither JPS nor an affiliate of JPS was capable of performing on the term sheet and therefore JPS fraudulently induced Belle into signing the term sheet.  As is clear from the discussion above regarding the breach of contract claims, these counts sounding in fraud are inextricably intertwined with the breach of contract claims and, accordingly, there are disputed facts which also preclude these counts from being resolved at the summary judgment stage.  Additionally, Belle has not pointed to any evidence in the record of JPS' alleged fraudulent intent.  "[W]hen reasonable men may differ as to whether a representation was material or whether a false answer was made with intent to deceive, those questions must be submitted to the jury." Cardwell v. U.S., 186 F.2d 382 (5th Cir. 1951)[3].  The inferences that could be drawn from the undisputed facts in this case could be sufficiently persuasive and plausible to a reasonable jury to allow them to conclude that JPS did not have the present intention of misleading and defrauding JPS into entering into the alleged agreement at issue.  See, e.g., Home Design Services, Inc. v. David Weekley Homes, 548 F.Supp.2d 1306, 1311 (M.D. Fla. 2008) (denying summary judgment where, depending on the underlying factual details, a reasonable jury could find evidence of an explanation other than an intent to deceive).  Accordingly, summary judgment is DENIED as to Counts II and III.

---

[3] In Bonner v. City of Pritchard, 661 F.2d 1206, 1207 & 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

**Conclusion**

Based upon the foregoing, it is hereby **ORDERED AND ADJUDGED** that Belle's Motion for Partial Summary Judgment as to Liability and Partial Damages (DE 36) is **DENIED**.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 29th day of October, 2009.

_____
KENNETH A. MARRA
United States District Judge

Copies provided to:

all counsel of record